MaddeN, Judge,
delivered the opinion of the court:
In these three cases the facts have been stipulated by the parties. All the cases present the same question of law *641 and this opinion will apply to all of them. There is3 in the case of the Texas Company, an additional problem not involved in the other two cases. That problem will be adverted to in dne course.
The plaintiffs seek to recover Federal income taxes which they were required to pay because the Government fixed the cost basis, of ships owned by them, at a lower figure than that which the plaintiffs say was the correct figure, and thereby reduced the amount of the deduction for depreciation to which the plaintiffs claim they were entitled for the years in question.
The case of Socony Mobil Oil Company, Inc. is, in its essentials, typical of the three cases, and the facts of that case will be used in this discussion. The word plaintiff, when used without qualification, will refer to that plaintiff.
During the war years 1942,1943,1944, and 1945 the plaintiff bought from the United States Maritime Commission twelve ships, and paid for them a total of $28,204,659.59, mostly in cash but partly in old ships traded in by the plaintiff to the Commission.
On March 8, 1946, the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C. App. (1952 ed.) § 1735 ff., became effective. Section 1742 of the above Code citation is section 9 of the Act, which section is important in these cases.
The 1946 Act as a whole provided for the sale by the Government of ships which had been constructed for it. It prescribed formulae for setting “statutory sales prices” at which such ships would be offered for sale. In its section 9 it provided that purchasers of ships which had been sold by the Government before March 8,1946, could apply to the Maritime Commission for an adjustment of the price which they had paid. If the adjustment was granted, a part of the higher price which they had paid would be refunded to them.
Section 9 cited above prescribes in detail the items which were to be adjusted if a prior purchaser applied for adjustment. The section is long and complicated and will not be reprinted in this opinion. Subsection (b) of section 9 says:
Such adjustment shall be made, as hereinafter provided, by treating the vessel as if it were being sold to the *642 applicant on the date of the enactment of this Act, and not before that time.
The several paragraphs of subsection (b) provide for credits to be given by the Commission to the purchaser, and other credits to be given by the purchaser to the Commission, all of which credits shall enter into the adjustment. Paragraph (4) provides that the Commission shall credit the purchaser with the amount by which the price paid by the purchaser exceeded the statutory sales price set under the 1946 Act. Paragraph (5) provides that the Commission shall credit the purchaser with interest at Sy2 percent per annum on the excess of the original purchase price over any trade-in allowance received, from the date of the original purchase to the date of the 1946 Act. Paragraph (6) provides that the purchaser shall credit the Commission with the amount of charter hire which the United States had paid to the purchaser for the use of the vessels between the time of the purchase and the date of the Act, and that the Commission shall credit the purchaser with the charter hire which the United States would 'have paid for the use of the traded-in ships for the same period.
Paragraph (8) provides that there shall be deducted from the charter hire credits in favor of the Commission the amount of Federal taxes paid by the purchaser upon the charter hire received from the Government but now credited back to the Government pursuant to paragraph (6). It also provides that there shall be deducted from the credits in favor of the purchaser the amounts by which the purchaser’s Federal taxes have been reduced, during the interim period, by taking deductions for depreciation and amortization on the ships. The specific provision about such interim depreciation and amortization is in subsection (c) (1) of section 9.
Subsection (b) (8) says:
If, after making such subtractions, the sum of the credits in favor of the applicant exceeds the sum of the credits in favor of the Commission, such excess shall be paid by the Commission to the applicant.
*643 In the case under discussion, that of Socony Mobil Oil Company, the computation based upon the respective credits in favor of the plaintiff and the Commission showed a net credit in favor of the plaintiff of $4,615,243.23, which sum the Commission paid to the plaintiff.
These cases, as we said at the outset, require us to determine the correct basis on which the plaintiffs were entitled to compute depreciation, for the tax years in question, upon the ships bought by them from the Maritime Commission before the enactment of the Merchant Ship Sales Act of 1946, the price of which ships was readjusted pursuant to the provisions of section 9 of that Act.
The Government’s contention is that the basis of the ships is their “statutory sales price” as set by the 1946 Act. If a person who had bought no ships from the Commission before March 8,1946 had bought these ships from the Commission after that date, he would have paid the statutory sales price for them, and that would have been his cost and his basis for depreciation. If these plaintiffs, having bought the ships in question before 1946, had decided not to apply for a readjustment of their prior purchases, which they were permitted to do by section 9 of the Act, but to leave the prior transaction undisturbed and to buy some additional ships at the reduced prices of the 1946 Act, they would have paid the statutory sales prices for the additional ships, and that would have been their cost and their basis of depreciation for the additional ships. They could have gone on taking depreciation on the prior purchased ships on their high cost basis.
In determining whether to apply for a readjustment of its prior ship purchases, the plaintiff Socony Mobil Oil Company could set its accountants to work with the several credit and debit provisions of the paragraphs of section 9. Their computations would show that, taking all the items into account, a section 9 readjustment would bring the company a check for $4,615,243.23. There would be, then, no difficulty in reaching a decision to apply for a section 9 readjustment. The application was made and the check was received.
*644 Our task is to determine how much the ships cost the plaintiff. The plaintiff says that it paid $28,204,659.59 for the ships; that it got back $4,615,243.23 in the section 9 readjustment ; that its cost was, therefore, $23,589,416.36. It concedes that that cost should be reduced by $6,565,741.95 for a reason not here in dispute, which leaves a net cost, claimed by the plaintiff, of $17,023,674.41.
The Government’s position is that the plaintiff’s cost was the statutory sales price of the ships which, the parties agree, was $19,804,682.30. It would deduct from that amount the undisputed $6,565,741.95 referred to above, and arrive at the figure of $13,238,940.35. The difference of $3,784,734.06 between the cost figures arrived at by the parties is the amount on which, the plaintiff asserts and the Government denies, depreciation is deductible for Federal tax purposes.
Section 23 of the Internal Eevenue Code of 1939, 26 U.S.C. (1952 ed.) § 23, permits a deduction for depreciation of property used in the taxpayer’s trade or business. Section 113 of the Code, 26 U.S'.C. (1952 ed.) § 113, says:
The basis of property shall be the cost of such property.
It would seem that if one has bought property and paid $10,000 for it, and the seller later offers to readjust the price, according to a complicated formula, and when the computation is completed, the seller gives back to the buyer $3,117.24, the property has cost the buyer $6,882.76. That being, in fact, his cost, it would seem to be his basis for computing depreciation, if the property is depreciable for tax purposes.
The Government does not deny that the plaintiff’s depreciation should be based upon its cost. But it says that the plaintiff’s “cost” for this tax purpose is not the difference between what it originally paid and what it got back in the section 9 readjustment. That means that the Government’s asserted “cost” is not the economic, dollars-and-cents cost, but an artificial figure, legally deemed, for this tax purpose, to be the cost though it is not in fact the cost.
Congress could, of course, have provided that a former purchaser of ships who desired to take advantage of the *645 readjustment of price offered Mm by section 9 should, as a condition of the readjustment, obligate Mmself to compute future depreciation on a basis other than actual cost. Congress could have done this expressly, or by writing a text from which such an implication would necessarily result. Congress has not done so expressly, and we do not find that it has shown an intent to do so.
A bill was considered and rejected by the House of Eep-resentatives wMch would have, if enacted, supported the Government’s position. See H.E. 3603,79th Cong., 1st Sess. Instead, the House of Eepresentatives passed a bill containing a section which was essentially like the one which was finally enacted as section 9. See H.E. 3603, 79th Cong., 1st Sess., in the Senate, October 3 (Legislative Day, October 2) 1945 (as passed by the House on October 2, 1945). The Senate, however, enacted a bill containing a section which was similar to the one which had been rejected by the House of Eepresentatives. See section 9 of H.E. 3603, 79th Cong., 1st Sess., in the Senate, December 4 (Legislative day,. October 29) 1945. That bill contained a section 9 (e) (1) which provided:
If an adjustment in the purchase price of a vessel is made under this Section, the income and excess profits taxes of the vessel owner under the Internal Eevenue Code for the taxable year within which the delivery of the vessel was made to the purchaser and for subsequent taxable years, shall be redetermined. For such purposes of redetermination the vessel shall be considered as having been acquired at the adjusted purchase price, and the income and deductions attributable to such vessel shall be determined as if this Section had been in effect on the date of such delwery. (Emphasis, supplied.)
If this Senate bill had become law, the Government’s position in these cases would be clearly correct. But in conference between the two houses, the House’s version was adopted, with changes not here important, and that version was enacted as section 9. See House of Eepresentatives Conference Eeport No. 1526, 79th Cong., 2d Sess., to accompany H.E. 3603, dated February 6, 1946. The Conference *646 Eeport makes no mention of the omission of section 9(e) (1) of the Senate bill, quoted above, but does, at page 17, mention one modification which the conference had made in the House-enacted bill. The modification had to do with the year of taxability of the amount credited by the Commission to the prior purchaser as interest on his overpayment.
This legislative history shows that the committees of Congress gave minute attention to the tax consequences, current and future, of the readjustment authorized by section 9. The bill as enacted by the Senate had in it an express provision that the statutory sales price should be the basis for future depreciation. The conference omitted this provision, and the Act as passed omitted it. There is no room for an implication that Congress, having considered and omitted it, showed, by other parts of section 9, an intent to retain it.
The Treasury took the position which the Government takes here, that the statutory sales price is the correct basis for depreciation. Mimeograph 6366,1949-1 Cum. Bull. 270. In 1950 the 81st Congress, 2d Session, passed H.R. 3419, which would have amended section 9(b) by adding the following paragraph at its end:
From and after March 8, 1946 (the date of enactment of the Act), the cost basis of a vessel in respect of which the price adjustment is made shall be the undepreciated original purchase price reduced by the net amount of such adjustment in favor of the applicant resulting from the application of all of the foregoing provisions of this subsection.
The two Congressional committees which had considered section 9(b) when it was originally enacted considered the quoted amendment and explained in their reports that the position taken by the Treasury had made clarifying legislation necessary. See House of Representatives Report No. 1342, 81st Cong., 1st Sess., p. 2 and Senate Report No. 1915, 81st Cong., 2d Sess., p. 2. An expression of opinion as to the meaning of a statute, made some four years after the enactment of the statute by the same Congressional committee which had considered that statute at the time of its enactment, is an important circumstance for consideration *647 in interpreting the statute. Sioux Tribe of Indians v. United States, 316 U.S. 317, 329.[1]
The President vetoed H.R. 3419. His veto message is in 96 Cong. Rec. pp. 15,791-2. The fact that the bill was vetoed does not detract from its weight as evidence of the intent of Congress and its committees in their drafting of section 9 (b) in the 1946 Act.
Section 9, in its subsection (c) (2), provides that if the Government charters a ship of which the price has been readjusted under section 9, it shall not pay more per annum than 15 percent of the statutory sales price, and that if the Government loses a ship so chartered it shall not pay more than the statutory sales price, properly depreciated, for the lost ship. We see nothing in these provisions except evidence that Congress was aware, in minute detail, of the problems that would be presented by section 9 readjustments, and provided specific solutions of those problems in the statute, and did not leave them open for judicial interpretation.
The readjusted price which the plaintiffs had to pay for their ships in order to take advantage of the readjustment offered them by section 9 was more than the statutory sales price. Neither the express terms of the statute, those terms in their context, nor the relevant legislative history indicate a legislative intent that the basis for depreciation of these ships should be an artificial, legally constructed figure different from their actual mathematically computed cost.
In the case of Barber Oil Corporaton v. Manning, 135 F. Supp. 451 (D.N.J.1955), the court rejected the Government’s position, which was the same as its position in the instant cases.
*648 As we said at the beginning of this opinion, there is an additional problem involved in the case of the plaintiff Texaco, Inc. That plaintiff’s suit relates to its tax years 1946, 1947, 1948, and 1949. The Government has pleaded the statute of limitations as to the years 1946 and 1947. Timely claims for refund for those years were filed by the plaintiff. The Commissioner mailed statutory notices disallowing the claims. Section 8772(a) (2) of the Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.) § 3772(a) (2), provides that suits on such claims must be filed within two years after the date of the mailing of the notice of disallowance. But section 3774(b) (2) provides that the Commissioner of Internal Revenue and a taxpayer may make an agreement that the running of the statute of limitations shall be suspended during the pendency in court of a test case involving the question which has arisen between the Commissioner and the taxpayer. In the instant case Texaco, Inc. and the Commissioner made an agreement that the running of the statute “is hereby suspended from the date the Commissioner signs this agreement to the date of final decision” in the case of Barber Oil Corporation v. John Manning, then pending in the United States District Court for the District of New Jersey. The Barber Oil case was the case cited above. Manning was a former Collector of Internal Revenue.
At the time this agreement was made, the District Court had rendered an initial decision against the Government in the Barber Oil case, with an opinion, as cited above. Thereafter the parties to that case settled it by agreement and presented to the court a stipulation that it had been so settled and that the plaintiff’s petition should be dismissed with prejudice. The court endorsed such an order upon the stipulation.
If the suspension of the running of the statute of limitations was lifted on the day of the signing of the order, the plaintiff’s suit was filed too late, as to the years 1946 and 1947. The plaintiff says that the “final decision” of the Barber Oil case, within the meaning of its agreement, did not take place until 60 days after the District Court’s decision, 60 days being the time within which appeals may be *649 taken from District Court decisions to the United States Courts of Appeals. The Government says that the District Court’s order dismissing the case was the final decision because the plaintiff’s petition was, with the plaintiff’s consent, dismissed with prejudice. Of course neither party could have appealed from this order, without a showing of fraud or mistake, and the case was, in fact, finally terminated.
When the Commissioner made his suspension agreement with the plaintiff, he must have contemplated using the Barber Oil case as a test case. Section 3774(b) (2) referred to above, came into the Revenue laws as section 608 of the Revenue Act of 1928, 45 Stat. 874. Its purpose, as stated in the Senate Finance Committee Report, Senate Report No. 960, 70th Cong., 1st Sess., was to “prevent a multiplicity of suits” while a test case was pending. The Commissioner, when the Barber Oil case was decided against the Government, was in a position to pursue the test of the law by appealing to the United States Court of Appeals. Instead, the case was settled. We are not informed of the terms of the settlement, but it may be surmised that the Government paid some substantial sum to escape from the District Court’s adverse decision.
It seems that such a premature termination of what was expected to be a test case would not have been anticipated by Texaco, the other party to the suspension agreement. Unless the Government advised it of the settlement, it would have had to be most diligent in watching the District Court’s judgment docket in order to file its suit in time after the “final decision” of the test case.
We think that when the Commissioner has entered into an agreement for the suspension of the statute of limitations until the final decision in a test case, and thereafter participates in the frustration of the purpose of the agreement by preventing the test case from going to a decision on the merits, a fair interpretation of the agreement makes the suspension run until the earlier of the following two events: (1) The other party to the agreement has had notice of the premature termination of the test case, or (2) the time for an appeal would have expired, if the problem intended to *650 be tested had been decided by the court in which the test case was pending.
The plaintiffs are entitled to recover, with interest as provided by law, and judgments will be entered to that effect. The amounts of recovery will be determined pursuant to "Rule 38(c).
It is so ordered.
Need, Justice (Bet.), sitting by designation; DtjReee, Judge; LaRAmoke, Judge, and Jones, Chief Judge, concur.
FINDINGS OE PACT
The court makes findings of fact, based upon the stipulations of the parties, and the briefs and argument of counsel, as follows:
Nos. 168-59 and 169-59
1. Plaintiff Socony Mobil Oil Company, Inc., is a corporation organized under the laws of the State of New York and having its principal office in New York, New York.
2. (a) Plaintiff duly filed its Federal income tax return for the year 1946 with the Collector of Internal Revenue (now District Director of Internal Revenue) — Lower Manhattan District, New York, N.Y., and on or before the date fixed by law for payment of taxes in installments, paid income taxes for the year 1946 in the amount of $16,703,308.58 shown to be due on its return to the Collector of Internal Revenue.
(b) Upon examination and audit of plaintiff’s income tax return for 1946, the Commissioner of Internal Revenue determined a deficiency in income tax for that year in the amount of $4,812,511.68 plus interest in the amount of $868,748.06. The final payment with respect to this deficiency was made by plaintiff on November 29, 1956, together with interest as provided by law.
3. (a) Within the time required by law, plaintiff filed its Federal income tax return for the year 1947 with the Collector of Internal Revenue (now District Director of Internal Revenue) — Lower Manhattan District, New York, N.Y., and on or before the date fixed by law for payment of taxes in installments, paid income taxes for the year 1947 in the *651 amount of $30,705,177.26 shown to be due on its return to the Collector of Internal Revenue.
(b) Upon examination and audit of plaintiff’s income tax return for 1947, the Commissioner of Internal Revenue determined a deficiency in income tax for that year in the amount of $2,962,621.20 plus interest in the amount of $972,534.50. The final payment with respect to this deficiency was made by plaintiff on November 29, 1956, together with interest as provided by law.
4. In the years 1942, 1943, 1944, and 1945, plaintiff purchased from the United States Maritime Commission 12 vessels pursuant to Section 509 of the Merchant Marine Act, 1936, c. 858,49 Stat. 1985, 46 U.S.C. (1952 ed.) § 1159. The total purchase price of the 12 vessels was $33,112,069.59, of which $24,974,659.59 was paid in cash. The balance of $8,137,410 was paid through an allowance for 12 vessels traded in and delivered to the Commission. No gain was recognized for Federal income tax purposes on the trade-in of the 12 vessels traded in by reason of Section 510 (e) of the Merchant Marine Act, 1936, 46 U.S.C. (1952 ed.) § 1160(c). The adjusted cost basis of the 12 vessels traded in was $1,519,528.55.
5. The vessels, upon delivery to plaintiff, were chartered by the Government until various dates in 1945 and 1946. At various times during the charters, the Government paid charter hire to plaintiff. On its Federal income tax returns for the years 1942-46, plaintiff reported all such charter hire as income and deducted depreciation expense in respect of the 12 vessels.
6. On March 8,1946, Congress enacted the Merchant Ship Sales Act of 1946, c. 82, 60 Stat. 41, 50 U.S.C. App. (1952 ed.) § 1735, hereinafter referred to as “the Act”. Under Section 4 of the Act, citizens of the United States were given the right to purchase from the United States Maritime Commission war-built vessels at the statutory sales price defined in Section 3(d). Purchasers were required to pay at the time of sale at least 25% of the statutory sales price and the balance was payable in not more than twenty equal annual installments with interest at 3*4% per annum. The Government asserts and plaintiff does not deny that by January 15, *652 1951, 843 ships had been sold under Section 4 of the Act. Plaintiff does not, however, consider it relevant to this proceeding that citizens of the United States purchased ships from the Maritime Commission after March 8, 1946, under the Act.
7. In 1947, plaintiff bought two vessels from the Commission under Section 4 of the Act. For each vessel, plaintiff paid an amount equal to the statutory sales price, as defined in the Act, and has treated that amount, with adjustments required by law, as the cost of the vessels for tax purposes.
8. Under Section 3(d) of the Act, the statutory sales prices of the 12 vessels purchased by plaintiff totaled $19,804,682.30.
9. If another taxpayer had purchased from the Commission on March 8,1946, under Section 4 of the Act, 12 vessels identical to those here in question, except for improvements or additions made by plaintiff, that taxpayer would have had to pay to the Commission the statutory sales price of $19,804,682.30. The cost of the vessels for Federal income tax purposes would have been $19,804,682.30. Plaintiff does not consider it relevant that another taxpayer would have had to pay the statutory sales price for vessels if it had purchased them from the Commission on March 8, 1946.
10. Section 9 of the Act authorizes adjustments for certain sales of vessels to citizens made prior to March 8, 1946. Plaintiff filed with the Commission applications under Section 9 for an adjustment in the price of each of the 12 vessels purchased in 1942-1945. The applications were approved and an agreement for adjustment was entered into by plaintiff and the Commission under date of April 18, 1952. A copy of that agreement and the memoranda and schedule attached thereto are attached as Exhibit 1 to the stipulation filed by the parties, and are by reference made a part of these findings.
11. Section 9(b) of the Act provides that plaintiff and the Commission be given certain credits. Section 9(b)(8) provides that if the credits in favor of the applicant exceed the credits in favor of the Commission, such excess shall be paid by the Commission to the applicant. In this case, *653 there was an excess in favor of the applicant (plaintiff) of $4,615,243.23. On June 27, 1952, the Commission paid this amount to plaintiff without interest.
12. Pursuant to Exhibit 1, plaintiff’s trade-in allowance on the 12 vessels traded in was reduced by $4,907,410.00, from $8,137,410.00 to $3,230,000.00.
13. The credits which gave rise to the payment of $4,615,243.23 were as follows:
(a) Section 9(b) (4) provides that plaintiff shall be credited with the excess of the sum of the cash payments made upon the original purchase price of the vessels, plus a readjusted trade-in allowance for vessels traded in, over the statutory sales prices of the vessels under the Act. Under this subparagraph plaintiff was credited with an amount determined as follows:
Cash payment on original pur-
chase_$24,974,659.59
Readjusted trade-in allowance- 3,230, 000. 00
Total_ $28,204, 659. 59
Less statutory sales price_ 19, 804, 682.30
Total credit_ $8, 399, 977.29
(b) Section 9(b) (5) provides that, for each vessel purchased, the purchaser shall be given a credit equal to interest at the rate of 3%% per annum on the original purchase price of the purchased vessel, less any trade-in allowance, from the date of delivery to March 8,1946. By virtue of this provision, plaintiff was allowed credits totaling $2,315,627.75.
(c) Section 9(b)(6) provides that for each vessel purchased, the Commission shall be allowed a credit equal to the charter hire paid to the purchaser for use of the vessel under any charter party made prior to March 8, 1946. By virtue of this provision, the Commission was allowed credits totaling $11,242,249.25.
(d) Section 9(b) (6) also provides that, for each vessel purchased, the purchaser shall be allowed a credit of the amount that would have been paid by the United States as charter hire for bare boat use of the vessel traded in on the original purchase for the period from the date on which *654 the vessel traded in was delivered to the Commission to March 8, 1946. By virtue of this provision, plaintiff was allowed credits totaling $3,978,797.57 for this hypothetical charter hire.
(e) Section 9 (b) (8) provides that a credit shall be allowable to the purchaser if an overpayment of taxes results from the application of Section 9(c) (1) and a credit shall be allowable to the Commission if a deficiency results from the application of Section 9 (c) (1). Section 9(c) (1) provides that the purchaser’s Federal income taxes shall be recomputed on the following assumptions:
(1) Depreciation and amortization on the vessels up to March 8,1946, shall not be allowable;
(2) Charter hire credited to the Commission under Section 9(b) (6) was never received by the purchaser,;
(3) Amounts credited to the purchaser under Sections 9(b) (5) and 9(b) (6) were income for the taxable year in which falls March 8,1946.
Becomputation of plaintiff’s taxes under these provisions resulted in a calculated overpayment of $1,506,445.05, and an underpayment of $343,355.18.
(f) Becapitulating, the credits under Section 9 (b) were as follows:
In favor of plaintiff:

Subparagraph Amount

(a)-$8, 399,977.29
(b)-2, 315, 627. 75
(d)-3, 978, 797.57
(e)-1, 506, 445. 05
Total _ $16,200,847.66
In favor of the Commission :

Subparagraph Amount

(c)_$11,242,249.25
(e)_ 343,355.18
Total 11, 585, 604.43
Net credit in favor of the plaintiff_ $4, 615, 243.23
The net credit in favor of plaintiff in the amount of $4,615,243.23 is set forth in the agreement of April 18, 1952 (see Finding 10).
*655 14.Defendant contends that plaintiff paid to the Commission that statutory sales price of the 12 vessels as follows:
Total cash paid on purchase of
vessels_$24, 974, 659. 59
Less cash credited to plaintiff as shown in Finding 13 (a)_ 8, 399, 977.29
Total _ $16,574,682.30
Readjusted trade-in allowance_ 3, 230, 000. 00
Statutory sales prices_ $19, 804, 682. 30
15.Plaintiff contends that its adjusted tax cost basis for these 12 vessels is as follows:
Cash paid on purchase of vessels_$24,974, 659. 59
Tax-depreciated cost of vessels traded in_ 1,519, 528.55
Original purchase price_$26,494,188.14
Refund of portion of purchase price received from Commission_ 4,615,243. 23
Net purchase price of 12 purchased vessels_$21, 878, 944. 91
Miscellaneous uncontroverted adjustments to net purchase price:
Unrecognized gains on involuntary conver-sions_ (5, 023, 567. 38)
Capital additions to vessels_ 168,296. 88
Adjusted cost basis_$17, 023, 674.41
Defendant submits that the adjusted cost basis of the 12 vessels is $13,238,940.35, which is equal to the statutory sales prices of $19,804,682.30, adjusted as stated in Finding 16.
16.In computing plaintiff’s income tax for 1946 and 1947, the Commissioner of Internal Eevenue allowed plaintiff a deduction for depreciation on the 12 vessels in question. The Commissioner used as the basis for depreciation the statutory sales prices of the vessels (which totaled $19,804,-682.30) adjusted downward on account of (1) unrecognized gain of $1,710,471.45 realized on the trade-in of 12 vessels and (2) payments of $5,023,567.38 made upon the 12 vessels from funds deposited in a construction reserve fund, and adjusted upward on account of certain improvements and betterments in the amount of $168,296.88 made to the 12 vessels in question. Plaintiff does not challenge the correct *656 ness of these adjustments but submits that the Commission erred in using the statutory sales prices as the cost of the vessels.
17. Plaintiff filed timely claims for refund of the amount of tax 'here in controversy for the years 1946 and 1947. Copies of the claims are attached as Exhibits 2 and 3 to the stipulation filed by the parties, and are by reference made a part of these findings.
18. The claims for refund were informally rejected by the Commissioner of Internal Revenue prior to April 16, 1957, and on that date plaintiff signed and duly filed Waiver of Registered Mail Notification of Claim Disallowance, Treasury Department Form 2297.
19. Plaintiff and defendant agreed that the trial in this proceeding be limited to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery and the amount of offsets, if any, for further proceedings under Rule 38(c).
Nos. 49-58, 50-58^ 327-58, and 328-58
1. Plaintiff Texaco Inc. is a corporation organized under the laws of the State of Delaware and having its principal office at 135 East 42nd Street, New York 17,, New York. Plaintiff was formerly known as The Texas Company, and by amendment of its Certificate of Incorporation filed with the Office of the Secretary of State of the State of Delaware on April 30, 1959, changed its name to Texaco Inc. effective May 1, 1959.
2. (a) Plaintiff duly filed its Federal income tax return for the year 1946 with the Collector of Internal Revenue (now District Director of Internal Revenue), Austin, Texas, and on or before the date fixed by law for payment of taxes in installments paid income taxes for the year 1946 in the amount of $15,760,821.62.
(b). Upon examination and audit of plaintiff’s income tax return for 1946, the Commissioner of Internal Revenue determined a deficiency in income tax for that year in the amount of $701,321.61. This deficiency together with interest as provided by law was paid by plaintiff between April 10 and June 2, 1950. Thereafter, certain claims for refund *657 were allowed to plaintiff by the Commissioner of Internal Revenue and income tax and interest in the amount of $160,920.77 was refunded or credited to plaintiff.
3. (a) Within the time required by law, plaintiff hied its Federal income tax return for the year 1947 with the Collector of Internal Revenue (now District Director of Internal Revenue), Austin, Texas, and on or before the date fixed by law for payment of taxes in installments plaintiff paid income taxes in the amount of $22,960,685.88 shown to be due on its return to the Collector of Internal Revenue.
(b) The Commissioner of Internal Revenue upon examination and audit of plaintiff’s income tax return for the year 1947 proposed a deficiency in income tax for that year in the amount of $465,962.39. This deficiency together with interest thereon in the amount of $75,521.17 was assessed in March 1951. This assessment was satisfied by a payment of $510,922.37 to the Collector of Internal Revenue on April 9, 1951, and an abatement of $30,516.59. A second deficiency assessment of $14,078.30 together with interest thereon was satisfied by a credit. Income tax of $10,142.47 with interest thereon was credited or refunded to plaintiff.
4. (a) Within the time required by law plaintiff filed its Federal income tax return for the year 1948 with the Collector of Internal Revenue (now District Director of Internal Revenue), Austin, Texas, and on or before the date fixed by law for payment of taxes in installments plaintiff paid income taxes in the amount of $40,549,089.34 shown to be due on its return to the Collector of Internal Revenue.
(b) The Commissioner of Internal Revenue upon examination and audit of plaintiff’s return proposed a deficiency in income tax for the year 1948 in the amount of $975,287.53. This deficiency together with interest thereon as provided by law was paid by plaintiff to the Collector of Internal Revenue on or about November 26, 1951. Thereafter, income tax in the amount of $10,405 with interest thereon was refunded to plaintiff.
5. (a) Within the time required by law plaintiff filed its Federal income tax return for the year 1949 with the Collector of Internal Revenue (now District Director of Internal Revenue), Austin, Texas, and on or before the date *658 fixed by law for payment of taxes in installments plaintiff paid income taxes in the amount of $16,873,530.91 shown to be due on its return to the Collector of Internal Revenue.
(b) The Commissioner of Internal Revenue upon examination and audit of plaintiff’s return proposed a deficiency in income tax for the year 1949 in the amount of $849,340.98. That deficiency together with interest thereon as provided by law was paid by plaintiff to the Collector of Internal Revenue on November 26, 1951. Thereafter, income tax in the amount of $1,677.97 with interest thereon was refunded to plaintiff.
6. In 1943 and 1944, plaintiff purchased from the United States Maritime Commission seven type T2-SE-A1 tank vessels pursuant to Section 509 of the Merchant Marine Act, 1936, c. 858, 49 Stat. 1985, 46 U.S.C. (1952 ed.) § 1159. ' The total purchase price of the seven vessels was $20,134,180.85 of which a certain amount was paid in cash and $2,498,580 was paid through an allowance for four vessels traded in and delivered to the Commission. No gain was recognized for tax purposes on the trade-in of the four vessels by reason of Section 510(e) of the Merchant Marine Act, 1936, 46 U.S.C. (1952 ed.) § 1160(c). The balance of the purchase price was represented by mortgages on the seven vessels. As of March 8, 1946, cash payments made by plaintiff totaled $5,501,823.56 and the balance of plaintiff’s mortgage indebtedness was $12,133,727.29.
7. Upon delivery of the vessels to plaintiff, they were chartered by the Government until various dates in 1945. At various times during the charters, the Government paid charter-hire to plaintiff. On its federal income tax returns for the years 1943-1945, plaintiff reported the charter-hire as income and deducted depreciation for the seven vessels.
8. On March 8,1946, Congress enacted the Merchant Ship Sales Act of 1946, c. 82, 60 Stat. 41, 50 U.S.C. App. (1952 ed.) § 1735, hereinafter referred to as “the Act.” Under Section 4, citizens of the United States were given the right to purchase from the United States Maritime Commission war-built vessels at the statutory sales price defined in Section 3(d). Purchasers were required to pay at the time of *659 sale at least 25% of the statutory sales price and the balance was payable in not more than twenty equal annual installments with interest at 3y2% per annum. By January 15, 1951, 843 ships had been sold under Section 4 of the Act. Plaintiff does not consider it relevant to this proceeding that citizens of the United States purchased ships from the Maritime Commission after March 8, 1946, under the Merchant Ship Sales Act of 1946.
9. In 1947 and 1948, plaintiff bought five vessels from the Commission under Section 4 of the Act. For each vessel, plaintiff paid an amount equal to the statutory sales price and has treated this amount with adjustments required by law as the cost of the vessel for tax purposes. For the years 1947, 1948, and 1949, plaintiff has claimed, and the Commissioner of Internal Eevenue has allowed, depreciation deductions for the five vessels computed upon the basis shown in the schedule attached as Exhibit 1 to the stipulation filed by the parties, by reference made a part of these findings. Plaintiff does not consider it relevant to this proceeding that it purchased vessels from the Maritime Commission under Section 4 of the Merchant Ship Sales Act of 1946 after March 8,1946.
10. Section 9 of the Act authorizes adjustments for certain sales to citizens made prior to March 8, 1946. Thereafter, plaintiff filed with the Commission applications under Section 9 for an adjustment in the price of each of the seven vessels purchased in 1943 and 1944. The applications were approved and an agreement for adjustment was entered into by plaintiff and the Commission under date of December 14, 1949. A copy of the agreement is attached as Exhibit 2 to the stipulation filed by the parties, by reference made a part of these findings.
11. Under Section 3(d) of the Act, the statutory sales prices of the seven vessels purchased by plaintiff totaled $11,945,523.49.
12. If another taxpayer had purchased from the Commission on March 8, 1946, under Section 4 of the Act, seven vessels identical to those here in question except for improvements or additions made by plaintiff, that taxpayer would *660 have had to pay the statutory sales price of $11,945,523.49 for the vessels. The cost of the vessels for tax purposes would have been $11,945,523.49. Plaintiff does not consider it relevant that another taxpayer would have had to pay the statutory sales price for vessels if it had purchased them from the Commission on March 8,1946.
13. Pursuant to the agreement of December 14, 1949, and Section 9(b) (3), plaintiff’s mortgage indebtedness was reduced by $4,306,718.68 from-$12,133,727.29 to $7,827,008.61. After March 8, 1946, plaintiff made payments to the Commission totaling $7,827,008.61 which were used to satisfy plaintiff’s reduced mortgage indebtedness.
14. Pursuant to the agreement of December 14,1949, plaintiff’s trade-in allowance was reduced by $1,366,446 from $2,498,580 to $1,132,134.
15. Section 9(b) of the Act provides that plaintiff and the Commission be given certain credits. Section 9(b) (8) provides that if the credits in favor of the Commission exceed the credits in favor of the applicant, such excess shall be paid by the applicant to the Commission. In this case, there was an excess in favor of the Commission in the amount of $1,121,111.61. On January 30, 1950, plaintiff paid this amount without interest to the Commission.
16. The credits which gave rise to the payment of $1,121,111.61 were as follows:
(a) Section 9(b) (1) provides that, for each vessel purchased the purchaser shall be given a credit for the excess of the cash payments made before March 8, 1946, over 25% of the statutory sales price. For five of the vessels purchased, plaintiff paid, before March 8, 1946, $2,947,966.69 in excess of 25% of the statutory sales prices and was therefore given credits totaling $2,947,966.69.
(b) Section 9(b)(1) also provides that, where the cash payments made before March 8, 1946, do not equal 25% of the statutory sales price, the purchaser shall pay to the Commission the difference between the amount so paid and 25% of the statutory sales price. For two of the vessels, plaintiff’s payments did not equal the 25% figure and plaintiff *661 therefore owed tbe Commission for the two vessels the sum of $432,524.01. Instead of plaintiff’s making a separate payment of this amount, the Commission was given credits equal to this amount.
(c) Section 9(b) (5) provides that, for each vessel purchased, the purchaser shall be given a credit equal to interest at the rate of 3%% per annum on the original purchase price less any trade-in allowance from the date of delivery to March 8,1946. By virtue of this provision, plaintiff was allowed credits totaling $1,710,763.38.
(d) Section 9(b) (6) provides that, for each vessel purchased, the Commission shall be allowed a credit equal to the charter hire paid to the purchaser for use of the vessel prior to March 8, 1946. By virtue of this provision, the Commission was allowed credits totaling $7,137,426.31.
(e) Section 9(b)(6) also provides that, for each vessel purchased, the purchaser shall be allowed a credit equal to the amount that would have been paid as charter hire for bareboat use of vessels traded in on the original purchase for the period from the date on which the vessels traded in were delivered to the Commission to March 8,1946. By virtue of this provision, plaintiff was allowed credits totaling $1,090,651.37 for this hypothetical charter hire.
(f) Section 9 (b) (8) provides that a credit shall be allowable to the purchaser if an overpayment of taxes results from the application of Section 9 (c) (1) and a credit shall be allowable to the Commission if a deficiency results from the application of Section 9(c) (1). Section 9(c) (1) provides that the purchaser’s Federal taxes shall be recomputed on the following assumptions:
1. Depreciation and amortization on the vessels up to March 8,1946, was not allowable;
2. Charter hire credited to the Commission under Section 9 (b) (6) was never received by the purchaser;
3. Amounts credited to the purchaser under Sections 9(b) (5) and 9(b) (6) were income for the taxable year in which falls March 8, 1946.
Recomputation of plaintiff’s taxes under these provisions resulted in a calculated overpayment of $699,457.27. Under *662 section 9(b)(8), plaintiff was allowed credits totaling $699,457.27.
(g) Recapitulating, the credits were as follows:
In favor of the Commission
(b) $432, 524.01
(d) 7,137,426.31
$7, 569, 950. 32
In favor of the plaintiff
(a) $2,947,966.69
(c) 1,710,763.38
(e) 1,090,651.37
(f) 699, 457. 27
6, 448, 838. 71
Net credit in favor of the Commission $1,121, 111. 61
The net credit in favor of the Commission in the amount of $1,121,111.61 is set forth in the agreement of December 14, 1949 (see Finding 10).
17. Defendant contends that plaintiff paid to the Commission the statutory sales price of seven vessels as follows:
Cash paid by plaintiff prior to
March 8, 1946_$5, 501, 823. 56 Less credit to plaintiff under section
9(b)(1) for cash paid prior to 3-8-46 in excess of'25% of statutory sales price of five vessels_ 2, 947, 966. 69
$2, 553, 856. 87
Cash paid by plaintiff on Jan. 30, 1950 (Amount equal to excess of 25% of statutory sales price of two vessels over amounts paid therefor prior to 3-8-46 — included in payment of $1,121,111.61 made by plaintiff to the Commission on January 30, 1950.)_ 432, 524. 01
Other cash paid by plaintiff after March 8, 1946_ 7, 827, 008. 61
Trade-in allowance on ships exchanged by plaintiff_ 1,132,134. 00
$11,945, 523.49 Total
*663 18. Plaintiff contends that the cost basis of the seven vessels is as follows:
Original purcliase price_ $20,134,130. 86
Less: Reduction in trade-in al-
lowance from_$2,498, 680. 00
to_ 1,132,134. 00
Net reduction_$1, 366, 446. 00
Reduction of mortgage indebted-
ness _ 4, 306, 718. 68
6, 673,164. 68
$14,460, 966.17
Plus: Cash adjustment in favor of U.S. Maritime Commission» 1,121, 111. 61
Cost basis seven vessels_ $15, 582, 077. 78

Proof

Cash paid prior to March 8, 1946_ $5, 501, 823. 56 Cash, adjustment in favor of U.S.
Maritime Commission_ 1,121, 111. 61
Readjusted trade-in allowance_ 1,132,134. 00
Adjusted Mortgage indebtedness_ 7, 827, 008. 61
Cost basis seven vessels_ $15, 582, 077. 78
Cost basis allowed by Commissioner of Internal Revenue (Adjusted Statutory Sales Price under Merchant Ship
Sales Act of 1946)_ 11, 945, 523.49
Amount of cost basis in controversy _ $3,636,554.29
19. In the computation of plaintiff’s income tax for 1946, 1947, 1948, and 1949, the Commissioner of Internal Revenue allowed plaintiff deductions for depreciation on the seven vessels in question. The Commissioner used as a basis for depreciation the statutory sales price of the vessels (which totaled $11,945,523.49) adjusted on account of (1) unrecognized gain of $999,016.09 realized on the trade-in of four vessels, (2) certain payments made upon five of the seven vessels in question from funds deposited in a construction reserve fund, and (3) certain improvements and betterments made to the seven vessels in question. These adjustments *664 are shown in the 3 schedules attached as Exhibits 3, 4, and 5 to the stipulation filed by the parties, by reference made a part of these findings. The plaintiff does not challenge the correctness of these adjustments but submits that the Commissioner erred in using the statutory sales prices as the cost of the vessels.
20. On October 28, 1953, plaintiff filed timely claims for refund for 1946,1947,1948, and 1949. Copies of the claims are attached as Exhibits 6, 7, 8, and 9 to the stipulation filed by the parties, by reference made a part of these findings.
21. Statutory notices of disallowance were mailed to plaintiff as follows:

Claim, for Year Date of Notice

1946 June 23,1954
1947 October 19, 1954
1948 August 7,1956
1949 August 14,1956
22. Plaintiff and the Commissioner of Internal Revenue entered into an agreement to suspend the running of the statute of limitations applicable to the claim for refund for 1946. This agreement became effective on June 8, 1956. A similar agreement for 1947 became effective on September 12, 1956. Copies of these agreements are attached as Exhibits 10 and 11 to the stipulation filed by the parties, by reference made a part of these findings. They refer to Barber Oil Corp. v. Manning, 135 F. Supp. 451, which was settled by agreement of the parties and dismissed upon their stipulation approved by the court on December 4, 1957. A copy of the stipulation is attached as Exhibit 12 to the stipulation filed by the parties, by reference made a part of these findings.
23. Plaintiff and defendant agreed that the trial in this proceeding be limited to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery and the amount of offsets, if any, for further proceedings under Rule 38(c).
Nos. 187-59 and 188-59
1. Plaintiff Mississippi Shipping Company, Inc. is a corporation organized under the laws of Louisiana and having *665 its principal office at Hibernia Bank Building, New Orleans 9, Louisiana.
2. (a) Plaintiff duly filed its Federal income tax return for the year 1946 with the Collector of Internal [Revenue, New Orleans, Louisiana (now District Director of Internal [Revenue), and on or before the date fixed by law for the payment of taxes in installments, paid income taxes for the year 1946 in the amount of $106,219.85.
(b) Upon examination and audit of plaintiff’s income tax return for 1946 the Commissioner of Internal Revenue determined an overassessment for the year 1946 in the amount of $5,753.73. This overassessment, together with interest thereon as provided by law, was paid to plaintiff on or about October 31,1952.
3. (a) Within the time required by law, plaintiff filed its Federal income tax return for the year 1947 with the Collector of Internal Revenue, New Orleans, Louisiana (now District Director of Internal Revenue), and on or before the dates fixed by law for the payment of taxes in installments, plaintiff paid income taxes in the amount of $626,588.76.
(b) The Commissioner of Internal Revenue upon examination and audit of plaintiff’s return determined a deficiency for the year 1947 in the amount of $79,331.06. This deficiency, together with interest thereon as provided by law, was paid by plaintiff on or about October 31, 1952.
4. In the years 1942, 1944, and 1945, plaintiff purchased from the United States Maritime Commission (hereinafter called the Commission) eight vessels pursuant to § 502 of the Merchant Marine Act, 1936, c. 858, 49 Stat. 1985, 46 U.S.C. (1952 ed.) § 1152. The total purchase price of the eight vessels was $18,406,794.28. A certain amount was paid in cash, and $790,962.00 was paid through an allowance for two vessels traded in to the Commission. The adjusted cost basis of the two vessels traded in was zero; on their trade in, no gain or loss was recognized by reason of § 510(e) of the Merchant Marine Act, 1936, 46 U.S.C. (1952 ed.) § 1160(e). The balance of the total price was represented by mortgages on the eight vessels. As of March 8, 1946, cash payments made by plaintiff totaled $5,094,870.28, and *666 the balance of plaintiff’s mortgage indebtedness was $12,520,962.00.
5. Certain of the vessels were chartered by the Government upon their delivery to plaintiff. At various times during the charters, the Government paid charter hire to plaintiff. On its Federal income tax returns for the years in which the charter hire was paid, plaintiff reported the charter hire as income and deducted depreciation for the vessels.
6. On March 8, 1946, Congress enacted the Merchant Ship Sales Act of 1946, c. 82, 60 Stat. 41,50 U.S.C. App. (1952 ed.) § 1735, et seq., hereinafter referred to as “the Act.” Under § 4 of the Act, 50 U.S.C. App. (1952 ed.) § 1737, citizens of the United States were given the right to purchase from the Commission war-built vessels at the statutory sales price defined in § 3(d) of the Act, 50 U.S.C. App. (1952 ed.) § 1736(d). Such purchasers were required to pay, at the time of sale, at least 25% of the statutory sales prices, and the balance was payable in not more than 20 equal annual installments with interest at 3%% per annum. By January 15, 1951, 843 ships had been sold under § 4 of the Act. Plaintiff does not consider relevant to this proceeding the fact that citizens of the United States purchased ships from the Maritime Commission after March 8,1946, under the Act.
7. In 1947 plaintiff bought six vessels from the Commission under § 4 of the Act. For each vessel plaintiff paid an amount equal to the statutory sales price and has treated this amount as the cost of the vessels for tax purposes. Plaintiff does not consider it relevant to this proceeding that it purchased vessels from the Commission under §4 of the Act after March 8,1946.
8. Section 9 of the Act, 50 U.S.C. App. (1952 ed.) § 1742, authorizes adjustments for certain sales to citizens made prior to March 8, 1946. Thereafter plaintiff filed applications under § 9 of the Act for an adjustment in the price of each of the eight vessels purchased in 1942, 1944, and 1945. The applications were approved and an agreement for adjustment was entered into by plaintiff and the Commission under date of November 9, 1949. A copy of the agreement *667 is attached as Exhibit 1 to the stipulation filed by the parties, and is by reference made a part of these findings.
9. Under § 3 (d) of the Act the statutory sales price of the eight vessels purchased by plaintiff totaled $13,693,262.00.
10. If another taxpayer had purchased from the Commission on March 8, 1946, under § 4 of the Act, eight vessels identical to those here in question, except for improvements or betterments made by plaintiff, that taxpayer would have had to pay the statutory sales price of $13,693,262.00 for the vessels. The cost of the vessels for tax purposes would have been $13,693,262.00. Plaintiff does not consider it relevant to this proceeding that another taxpayer would have had to pay the statutory sales price for vessels if it had purchased them from the Commission on March 8,1946.
11. Defendant contends that plaintiff paid to the Commission the statutory sales price of the eight vessels as follows:
Cash paid prior to March 8, 1946_$5, 094, 870. 28
Less cash credited to plaintiff under
See. 9(b)(1)_ 1,671,654.78
- $3, 423, 315. 50
Total credits under Sec. 9)b) (8) in favor of plaintiff - 651,196.78
Cash paid after March 8, 1946_ 9,107,178. 52
Trade-in allowance on ships exchanged_ 511, 571. 20
$13, 693,262. 00
12. Plaintiff contends that the cost basis of the eight vessels is as follows:
1. Original Purchase Price_$18,406, 794.28
2. Less: Price reduction if bought in 1946_ 4,713, 532.28
(B) 3. Statutory Sales Price at 3/8/46_ 13,693,262.00
4. Less: Other Adjustments (Date of Purchase to 3/8/46) :
a. Charter-hire paid by U.S. to Company_ 2,558, 353. 85
b. Adjustment of Trade-in Value of Vessels
Contractual Value_ 790, 962. 00
Adjusted Value_ 511,571.20
Net Trade-in Adjustment. (279,390/80)
*668 c. Interest on original price at 3%%- $607, 870. 41
<3. Tax Credit computed under Act_ 840, 560.15
e. Net Credits_ 1,169, 048. 76
f. Charter-Hire (Net after credits to Company.
Items 4a minus 4e)_ 1,389, 305. 09
(A) 5. Depreciable Cost-Basis (Items 3 plus 4f)— 15,082,567.09
6. Eeconeiliation:
a. Original Purchase Price- 18, 406, 794.28
b. Net of Adjustments under Section 9:
Credit to Company (Item 2)_ 4,713,532.28
Credit to Govt. (Item 4f)_ 1,389,305.09
Net Credit to Company_ 3,324,227.19
Depreciable Cost-Basis (per Company)_$15,082,567.09
The difference in depreciable cost-bases under the two parties’ contentions is:
(A) Per Company’s Contention (Item 5)-$15,082,567.09
(B) Per Treasury Department (Item 3)- 13,693,262.00
Difference in Allowable Depreciation- $1, 389, 305. 09
13. Pursuant to the agreement of November 9, 1949 (see Finding 8) and Section 9(b)(3), plaintiff’s mortgage indebtedness was reduced by $2,762,586.72 from $12,520,962.00 to $9,758,375.28. After March 8, 1946, plaintiff made payments to the Commission totaling $9,107,178.52. These payments plus credits of $651,196.78 explained below in Finding 17 were used to satisfy plaintiff’s reduced mortgage indebtedness.
14. Pursuant to the agreement of November 9,1949, plaintiff’s trade-in allowance was reduced by $279,390.80 from $790,962.00 to $511,571.20.
15. Section 9(b) of the Act provides that plaintiff and the Commission be given certain credits. Section 9(b) (8) provides that if the credits in favor of the applicant exceed *669 the credits in favor of the Commission, such, excess shall be paid by the Commission to the applicant. In this case there was an excess in favor of plaintiff in the amount of $561,640.49.
16. The credits which gave rise to the sum of $561,640.49 were as follows:
(a) Section 9(b) (1) provides that, for each vessel purchased, the purchaser shall be given a credit for the excess of the cash payments made before March 8, 1946, over 25% of the statutory sales price. For the eight vessels purchased, plaintiff paid before March 8,1946, $1,671,554.78 in excess of 25% of the statutory sales prices and was, therefore, given credits totaling $1,671,554.78.
(b) Section 9(b) (5) provides that, for each vessel purchased, the purchaser be given a credit equal to interest at the rate of 3%% per annum on the original purchase price less any trade-in allowance from the date of delivery to March 8, 1946. By virtue of this provision, plaintiff was allowed credits totaling $607,870.41.
(c) Section 9(b) (6) provides that, for each vessel purchased, the Commission be allowed a credit equal to charter hire paid to the purchaser for the use of the vessel prior to March 8,1946. By virtue of this provision, the Commission was allowed credits totaling $2,649,803.30.
(d) Section 9(b) (6) also provides that, for each vessel purchased, the purchaser shall be allowed a credit equal to the amount that would have been paid as charter hire for bareboat use of the vessel traded in for the period from the date the vessel traded in was delivered to the Commission to March 8,1946. By virtue of this provision, plaintiff was allowed credits totaling $91,449.45 for this hypothetical charter hire.
(e) Section 9(c)(1) provides that the purchaser’s Federal income taxes be recomputed on the following assumptions:
1. Depreciation and amortization on the vessels up to March 8,1946, was not allowable;
2. Charter hire credited to the Commission under § 9 (b) (6) was never received by the purchaser;
*670 3. Amounts credited to tlie purchaser under §§ 9(b) (5) and 9(b)(6) were income for the taxable year in which falls March 8,1946.
Eecomputation of plaintiff’s taxes under this provision resulted in overpayments totaling $875,319.94 and deficiencies totaling $34,750.79. Under § 9(b) (8) plaintiff was allowed credits totaling $875,319.94 and the Commission was allowed credits totaling $34,750.79.
(f) Kecapitulating, the credits were as follows:
In favor of plaintiff
(a)_$1,671,554.78
(b)_ 607,870.41
(d)_ 91,449.45
(e)_ 875, 319. 94
$3, 246,194. 58
In favor of the Commission
(e)_$2, 649, 803. 30
(e)_ 34, 750. 79
2, 684, 554. 09
Net credit in favor of plaintiff_ $561, 640. 49
17. The net credit of $561,640.49 in favor of plaintiff consisted of credits in favor of plaintiff on seven of the vessels totaling $651,196.78, and a credit on the eighth vessel in favor of the Commission in the amount of $89,556.29. The Commission did not issue a check for $561,640.49 to plaintiff. Instead the $651,196.78 in credits in favor of plaintiff were applied to plaintiff’s mortgage indebtedness on the seven vessels concerned as of March 8, 1946. This was done pursuant to the second paragraph of Article YIII of the agreement of November 9, 1949. The $89,556.29 credit in favor of the Commission was pursuant to the third paragraph of Article VIII satisfied out of payments made by plaintiff after March 8, 1946, in excess of the amount required to satisfy plaintiff’s mortgage indebtedness on the eight vessels.
18. Six of the eight vessels in question were delivered to plaintiff prior to January 1,1947. In computing plaintiff’s income tax for 1946, the Commissioner of Internal Eevenue allowed plaintiff a deduction for depreciation on the six *671 vessels. The Commissioner used as the basis for depreciation the statutory sales prices of the six vessels (which totaled $7,810,056.00) reduced by unrecognized gain of $170,528.73 realized on the trade-in of two vessels and increased by capital additions of $17,930 made by plaintiff during 1946. The remaining two vessels, Del Sud and Del Mar, were delivered to plaintiff in 1947. In computing plaintiff’s income tax for 1947, the Commissioner of Internal Eevenue allowed plaintiff a deduction for depreciation on the eight vessels in question. The Commissioner used as the basis for depreciation the statutory sales prices of the eight vessels (which totaled $13,693,262.00) reduced by unrecognized gain of $511,571.20' realized on the trade-in of two vessels and increased by capital additions of $363,836.74 made by plaintiff during 1946 and 1947. Plaintiff does not challenge the correctness of the adjustments for unrecognized gain and capital additions but submits that the Commissioner erred in using the statutory sales prices as the cost of the vessels.
19. On December 10,1953, plaintiff filed timely claims for refund for 1946 and 1947. Copies of the claims are attached as Exhibits 3 and 4 to the stipulation filed by the parties, and are by reference made a part of these findings.
20. The refund claims were rejected by the Commissioner of Internal Eevenue in a notice mailed to plaintiff by registered mail on December 12,1958.
21. Plaintiff and defendant agreed that the trial in this proceeding be limited to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery and the amount of offsets, if any, for further proceedings under Eule 38 (c).
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover and judgments will be entered to that effect. The amounts of recovery will be determined pursuant to Eule 38 (c).

 United States v. United Mine Workers, 330 U.S. 258, 281—282, is not to the contrary. That ease said only that the opinions of several Senators, some of whom had not been members of the Senate when the legislation in question had been considered, and none of whom had been members of the Committee which had reported the legislation and which opinions were expressed eleven years after the legislation had been passed, could not “serve to change the legislative intent of Congress expressed” when the legislation had been passed. Similarly, Rainwater v. United States, 356 U.S. 590, 593, indicates only that an interpretation by one Congress of a statute passed by another Congress more than a half century before has “very little, if any, significance.” See also the concurring opinion of Judge Littleton in The Equitable Life Assurance Society v. United States, 149 Ct. Cl. 316, 322, cert. denied 364 U.S. 829, and A. P. Green Export Co. v. United States, 151 Ct. Cl. 628.